U.S. Patent No. 8,484,111
*Inter Parte*- Review
Notice to Appeal

Case No. IPR2015-01750

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————————

RPX CORPORATION,
Petitioner

v.

APPLICATIONS IN INTERNET TIME LLC,
Patent Owner

————————————————

Case IPR2015-01750
US Patent No. 8,484,111
Title: INTEGRATED CHANGE MANAGEMENT UNIT

————————————————

_____

PATENT OWNER'S NOTICE OF APPEAL

U.S. Patent No. 8,484,111
*Inter Parte-* Review
Notice to Appeal                                                   Case No. IPR2015-01750

To the Director of the Patent and Trademark Office:

Patent Owner, Applications in Internet Time LLC, hereby notices its appeals from the Patent Trial and Appeal Board Final Written Decision dated December 28, 2016 (Paper 80), and all adverse rulings or orders leading up to the Final Written Decision.

In addition to other issues that may be raised on appeal, Patent Owner asks pursuant to 37 C.F.R. § 90.2(a)(3)(ii), that the appeal may raise one or more of the following legal issues:

1. Whether the Board's factual findings lacked substantial evidence because the Board did not explain why it relied upon one expert's opinion of claim construction and not the opinions of four other experts.

2. Whether the Board erred in its construction of claims 13-18 of the subject '111 patent including "fourth portion of the server … configured to automatically detect changes that affect the information in the first portion of the server or the information in the second portion of the server."

3. Whether the Board erred in determining that Petitioner demonstrated by a preponderance of the evidence that claims 13-18 are unpatentable under 35 U.S.C. § 102 as anticipated by Patent No. 6,249,291 ("Popp")

4. Whether the Board erred in determining that Petitioner demonstrated by a preponderance of the evidence that claims 13-18 are unpatentable under 35 U.S.C. § 102 as anticipated by Srdjan Kovacevic, *Flexible, Dynamic User Interface for Web-Delivered Training*, in AVI '96 Proceedings of the Workshop on Advanced Visual Interfaces 108-18 (1996) ("Kovacevic")

5. Whether the Board erred in determining that Petitioner demonstrated by a preponderance of the evidence that claims 13-18 are unpatentable under 35 U.S.C. § 103(a) as obvious in view of Patent No. 5,806,071 ("Balderrama") and

*Java Complete!*, 42 Datamation Magazine 5, 28-49 (Mar. 1, 1996) ("Java Complete").

6.  Whether the Board exceeded its statutory and regulatory authority in making its factual findings supporting the ultimate conclusions of anticipation and obviousness.

7.  Whether the Board lacked authority to proceed in rendering the Final Written Decision because it misconstrued the law of privity and real party in interest.

8.  Whether the Board erred in holding that Salesforce.com, Inc. was not an unnamed real party in interest.

9.  Whether the Inter Partes Review proceedings in general, and this case in particular, are unconstitutional and in violation of principles of administrative agency authority, including to the extent the Board is empowered (including under 35 U.S.C. §§ 311 and 316) to invalidate, cancel, and/or render unpatentable an issued patent without affording any deference or presumption of validity to the issued claims.

10. Any finding or determination supporting or related to those issues, as well as all other issues decided adversely to Patent Owner in any orders, decisions, rulings and opinions.

U.S. Patent No. 8,484,111
*Inter Parte*- Review
Notice to Appeal                                                    Case No. IPR2015-01750

Patent Owner has electronically filed this notice with the Patent Trial and Appeal Board, pursuant to 37 C.F.R. § 90.2(a)(1), 37 C.F.R. § 42.6(b)(1) and Federal Circuit Rule 15(a)(1). Simultaneously herewith, Patent Owner is providing the Federal Circuit an electronic copy of the present Notice of Appeal (pursuant to 37 C.F.R. § 90.2(a)(2)(i) and 15(a)(1)) together with a $500 fee (pursuant to 37 C.F.R. § 90.2(a)(2)(ii) and Federal Circuit Rule 52(a)(3)(A)).


Date: February 27, 2017                    Respectfully submitted,

                                           By: /Steven C. Sereboff/
                                           Steven C. Sereboff (Reg. No. 37,035)
                                           ssereboff@socalip.com
                                           Jonathan Pearce (Reg. No. 60,970)
                                           jpearce@socalip.com
                                           M. Kala Sarvaiya (Reg. No. 58,912)
                                           ksarvaiya@socalip.com
                                           SoCal IP Law Group LLP
                                           310 N. Westlake Boulevard, Suite 120
                                           Westlake Village, CA 91362
                                           Tele: (805) 230-1350 · Fax: (805) 230-1355
                                           *Attorneys for Applications in Internet Time LLC*

U.S. Patent No. 8,484,111
*Inter Parte-* Review
Notice to Appeal                                          Case No. IPR2015-01750

## CERTIFICATE OF SERVICE AND FILING

I hereby certify that on the date set forth below, in addition to being filed and served electronically through the Board's E2E System, a true and correct copy of the foregoing "PATENT OWNER'S NOTICE OF APPEAL," was served on the Director of the United States Patent and Trademark Office, via Express overnight delivery at the following address:

> Office of the General Counsel
> United States Patent and Trademark Office
> P.O. Box 1450
> Alexandria, VA 22313-1450

I also hereby certify that on the date set forth below, a true and correct copy of the foregoing "PATENT OWNER'S NOTICE OF APPEAL," and the filing fee, were filed with the Clerk's Office of the United States Court of Appeals for the Federal Circuit, via CM/ECF.

I also hereby certify that on the date set forth below, a true and correct copy of the foregoing "PATENT OWNER'S NOTICE OF APPEAL," was served, by electronic mail, upon the following:

> Richard F. Giunta        RGiunta-PTAB@wolfgreenfield.com;
> Elisabeth H. Hunt        EHunt-PTAB@wolfgreenfield.com;
> Randy J. Pritzker        RPritzker-PTAB@wolfgreenfield.com;
> Michael N. Rader         MRader-PTAB@wolfgreenfield.com

Dated: February 27, 2017                By:  /Anneliese Lomonaco/
                                             Anneliese Lomonaco
                                             SoCal IP Law Group LLP

Trials@uspto.gov
Tel: 571-272-7822

Paper 80
Entered: December 28, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

RPX CORPORATION,
Petitioner,

v.

APPLICATIONS IN INTERNET TIME, LLC,
Patent Owner.

————————

Case IPR2015-01750
Patent 8,484,111 B2

————————

Before LYNNE E. PETTIGREW, MITCHELL G. WEATHERLY, and
JENNIFER MEYER CHAGNON, *Administrative Patent Judges*.

CHAGNON, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*Inter Partes* Review
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2015-01750
Patent 8,484,111 B2

# I.    INTRODUCTION

We have jurisdiction to hear this *inter partes* review under 35 U.S.C. § 6.  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  For the reasons discussed herein, we determine that Petitioner has shown, by a preponderance of the evidence, that claims 13–18 of U.S. Patent No. 8,484,111 B2 (Ex. 1001, "the '111 patent") are unpatentable.

## A. *Procedural History*

RPX Corporation ("Petitioner") filed a Petition for *inter partes* review of claims 13–18 of the '111 patent.  Paper 1 ("Pet.").  Petitioner provided a Declaration of Mark E. Crovella, Ph.D. (Ex. 1002) to support its positions.  Applications In Internet Time LLC ("Patent Owner") filed a Preliminary Response.  Paper 21, Paper 26 (redacted version) ("Prelim. Resp.").  We also authorized additional briefing on issues relating to real parties-in-interest. *See* Paper 28, Paper 29 (redacted version) ("RPI Reply"); Paper 38, Paper 37 (redacted version) ("RPI Sur-Reply").

Pursuant to 35 U.S.C. § 314(a), on February 25, 2016, we instituted *inter partes* review to determine whether claims 13–18 are unpatentable under 35 U.S.C. § 102 as anticipated by Popp;[1] whether claims 13–18 are unpatentable under 35 U.S.C. § 102 as anticipated by Kovacevic;[2] and

---

[1] U.S. Patent No. 6,249,291 B1, issued June 19, 2001 (Ex. 1004).

[2] Srdjan Kovacevic, *Flexible, Dynamic User Interfaces for Web-Delivered Training*, in AVI '96 PROCEEDINGS OF THE WORKSHOP ON ADVANCED VISUAL INTERFACES 108–18 (1996) (Ex. 1005).

IPR2015-01750
Patent 8,484,111 B2

whether claims 13–18 are unpatentable under 35 U.S.C. § 103 as obvious in view of Balderrama[3] and Java Complete.[4]  Paper 51[5] ("Inst. Dec.").

Subsequent to institution, Patent Owner filed a Patent Owner Response (Paper 63 ("PO Resp.")[6]), along with Declarations of H. V. Jagadish, Ph.D. (Ex. 2032) and James Flynn (Ex. 2033) to support its positions.  Petitioner filed a Reply (Paper 70 ("Pet. Reply")) to the Patent Owner Response, along with a Reply Declaration of Dr. Crovella (Ex. 1062).  Pursuant to our authorization, Patent Owner filed a limited Sur-Reply (Paper 73 ("PO Sur-Reply")[7]).  A combined oral hearing for Cases IPR2015-01750, IPR2015-01751, and IPR2015-01752 was held on November 8, 2016.  A transcript of the hearing is included in the record. Paper 77 ("Tr.").

### B. Related Proceedings

The '111 patent is the subject of the following district court proceeding: *Applications in Internet Time LLC v. Salesforce.com, Inc.*, No. 3:13-cv-00628 (D. Nev.).  Pet. 3; Paper 6, 2.

Claims 1, 3–8, and 10–40 of related U.S. Patent No. 7,356,482 B2 ("the '482 patent") are the subject of *inter partes* review in IPR2015-01751

---

[3] U.S. Patent No. 5,806,071, issued Sept. 8, 1998 (Ex. 1006).

[4] *Java Complete!*, 42 DATAMATION MAGAZINE 5, 28–49 (Mar. 1, 1996) (Ex. 1007).

[5] A public version of the Institution Decision is available as Paper 60.

[6] Patent Owner filed a single Patent Owner Response in this proceeding and Cases IPR2015-01751 and IPR2015-01752.

[7] Patent Owner filed a single Sur-Reply in this proceeding and Cases IPR2015-01751 and IPR2015-01752.

IPR2015-01750
Patent 8,484,111 B2

and IPR2015-01752.  Pet. 3; Paper 6, 2; IPR2015-01751, Paper 51;
IPR2015-01752, Paper 51.

### C. The '111 Patent

The '111 patent, titled "Integrated Change Management Unit," relates
to an "integrated system for managing changes in regulatory and
non-regulatory requirements for business activities at an industrial or
commercial facility."  Ex. 1001, Abstract.  The integrated system described
in the '111 patent manages data that is constantly changing by
(1) "provid[ing] one or more databases that contain information on
operations and requirements concerning an activity or area of business,"
(2) "monitor[ing] and evaluat[ing] the relevance of information on
regulatory and non-regulatory changes that affect operations of the business
and/or information management requirements," (3) "convert[ing] the
relevant changes into changes in work/task lists, data entry forms, reports,
data processing, analysis and presentation . . . of data processing and
analysis results to selected recipients, without requiring the services of one
or more programmers to re-program and/or re-code the software items
affected by the change," and (4) "implement[ing] receipt of change
information and dissemination of data processing and analysis results using
the facilities of a network, such as the Internet."  *Id.* at 8:37–52, 9:4–5.

IPR2015-01750
Patent 8,484,111 B2

Figure 1 of the '111 patent is reproduced below:



FIG. 1

As shown in Figure 1, the integrated system operates at four layers: (1) change management layer 11 that identifies regulatory and non-regulatory changes that may affect a user's business, (2) Java data management layer 13 that generates a user interface ("UI"), (3) metadata layer 15 that provides data about the user interface including "tools, worklists, data entry forms, reports, documents, processes, formulas, images, tables, views, columns, and other structures and functions," and (4) business content layer 17 that is specific to the particular business operations of interest to the user. *Id.* at 9:38–52. According to the '111 patent, because the system of the invention is "entirely data driven," the need to write and compile new code in order to update the system is eliminated. *Id.* at 10:24, 12:44–56.

IPR2015-01750
Patent 8,484,111 B2

### D. Illustrative Claim

Of the claims subject to this *inter partes* review, claim 13 is independent. Claims 14–18 depend from claim 13. Claim 13 of the '111 patent, reproduced below, is illustrative:

> 13. A system, comprising:
>
> a server accessible by a browser executed on a client device, the server including a first portion, a second portion, a third portion, and a fourth portion,
>
> the first portion of the server having information about unique aspects of a particular application,
>
> the second portion of the server having information about user interface elements and one or more functions common to various applications, the various applications including the particular application,
>
> the third portion of the server being configured to dynamically generate a functionality and a user interface for the particular application, the functionality and the user interface of the particular application being based on the information in the first portion of the server and the information in the second portion of the server, the third portion of the server being configured to send the functionality and the user interface for the particular application to the browser upon establishment of a connection between the server and the client device,
>
> the fourth portion of the server being configured to automatically detect changes that affect the information in the first portion of the server or the information in the second portion of the server.

Ex. 1001, 33:19–34:8.

## II.   ANALYSIS

### A. Real Parties-in-Interest

In its Petition, Petitioner identifies itself, RPX Corporation, as the "sole real party-in-interest in this proceeding." Pet. 2. Prior to institution,

IPR2015-01750
Patent 8,484,111 B2

Patent Owner raised the issue of whether Petitioner has identified all real
parties-in-interest. In particular, Patent Owner asserted that Salesforce.com,
Inc. ("Salesforce") is an unnamed real party-in-interest. *See* Prelim.
Resp. 2–20.

> In our Institution Decision, we determined that Salesforce had not
been shown to be a real party-in-interest in these proceedings. *See* Inst.
Dec. 7–15. In its Patent Owner Response, Patent Owner argues:

> > In its decision instituting [this trial], the Board stated that
> > there was insufficient evidence to find that the real party in
> > interest is Salesforce.com, Inc. Patent Owner disagrees with
> > the Board's view of the law and the facts, and in particular
> > believes that the Board misconstrued the law. As explained
> > previously, the AIA was intended to prevent defendants from
> > getting "a second bite at the apple." Yet, the Board is doing
> > just that by allowing Petitioner to act indirectly for Salesforce.
> > In its decision, the Board set an improperly high burden of
> > proof for the patent owner, and also improperly shifted the
> > burden of proof to the patent owner. As explained in Patent
> > Owner's Preliminary Response, Salesforce is the real party in
> > interest and Petitioner is acting as its proxy. Because
> > Salesforce is time limited, so is Petitioner and patentability
> > should be confirmed on this basis.

PO Resp. 8. To the extent Patent Owner is attempting to incorporate
arguments made in the Preliminary Response into the Patent Owner
Response, such incorporation is improper under our rules. *See* 37 C.F.R.
§ 42.6(a)(3) ("Arguments must not be incorporated by reference from one
document into another document."). In any event, Patent Owner has neither
presented any new evidence into the record, beyond the evidence we
considered previously in rendering our Institution Decisions, nor cited any
legal authority to support its positions set forth above. Based on the
complete record now before us, we see no reason to change our previous

IPR2015-01750
Patent 8,484,111 B2

determination, and we are not persuaded that Salesforce should have been identified as a real party-in-interest in this proceeding.

### B. *Level of Ordinary Skill in the Art*

Petitioner asserts that a "person of ordinary skill in the art in the timeframe of the December 1998 priority date of the '111 patent . . . would have had at least a B.S. in Computer Science or the equivalent, along with at least two years of computer programming experience in developing applications for client-server systems." Pet. 5–6 (citing Ex. 1002 ¶ 10). Patent Owner indicates that it "does not dispute Petitioner's definition of the person of ordinary skill in the art." PO Resp. 10; Ex. 2032 ¶ 18; Ex. 2033 ¶ 17. For purposes of this Final Written Decision, we agree with and adopt Petitioner's proposed definition for the level of ordinary skill in the art, which each declarant in this proceeding meets or exceeds.[8] *See* Ex. 1002 ¶¶ 2–6, 11; Ex. 2032 ¶¶ 4–9, 19; Ex. 2033 ¶¶ 2–5, 18. We further note that the applied prior art reflects the appropriate level of skill at the time of the claimed invention. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

### C. *Claim Construction*

In an *inter partes* review, claim terms in an unexpired patent are given their broadest reasonable construction in light of the specification of the patent in which they appear. *See* 37 C.F.R. § 42.100(b); *Cuozzo Speed*

---

[8] Patent Owner argues that, in the relevant time frame, Dr. Crovella "was already considerably more than ordinary," and, for this reason, we should give less weight to Dr. Crovella's testimony. PO Resp. 11; *see also* Tr. 53:4–9, 55:24–56:4. We disagree. *See Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1363–64 (Fed. Cir. 2008) (noting that under Fed. R. Evid. 702, the expert must possess sufficient "expertise to be of assistance" to the trier of fact).

IPR2015-01750
Patent 8,484,111 B2

*Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016) (upholding the use of the broadest reasonable interpretation standard). Pursuant to that standard, the claim language should be read in light of the specification, as it would be interpreted by one of ordinary skill in the art. *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010). Thus, we generally give claim terms their ordinary and customary meaning. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007) ("The ordinary and customary meaning 'is the meaning that the term would have to a person of ordinary skill in the art in question.'" (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc))).

The claims, however, "should always be read in light of the specification and teachings in the underlying patent," and "[e]ven under the broadest reasonable interpretation, the Board's construction 'cannot be divorced from the specification and the record evidence.'" *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015) (citations omitted). In other words, "[u]nder a broadest reasonable interpretation, words of the claim must be given their plain meaning, unless such meaning is inconsistent with the specification and prosecution history." *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1062 (Fed. Cir. 2016) (citing *Straight Path IP Grp., Inc. v. Sipnet EU S.R.O.*, 806 F.3d 1356, 1362 (Fed. Cir. 2015)). Any special definition for a claim term must be set forth in the specification with reasonable clarity, deliberateness, and precision. *See In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). However, limitations are not to be read from the specification into the claims. *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

IPR2015-01750
Patent 8,484,111 B2

The parties' dispute requires construction of the phrase "fourth portion of the server being configured to automatically detect changes that affect the information in the first portion of the server or the information in the second portion of the server," recited in claim 13. No issue in this Decision requires express construction of any other claim terms. *See, e.g., Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1361 (Fed. Cir. 2011) ("[C]laim terms need only be construed 'to the extent necessary to resolve the controversy.'") (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

Claim 13 recites, in part, a "fourth portion of the server . . . configured to automatically detect changes that affect the information in the first portion of the server or the information in the second portion of the server." Ex. 1001, 34:5–8. In the Petition, Petitioner argues that a "portion of the server" is "any one or more components or functionality of or on the server." Pet. 11 (citing Ex. 1002 ¶ 22).

In its Patent Owner Response, Patent Owner asserts

> This [fourth portion] limitation, especially the phrase, "changes that affect," is clearly the same as the "changes" discussed above regarding the change management layer. Thus, the "fourth portion," as understood by a person of ordinary skill in the art and like the "change management layer" automatically detects changes that "arise from changes external to the application."

PO Resp. 21. With respect to the "change management layer,"[9] Patent Owner argues that "the term 'change management layer' when interpreted in

---

[9] The term "change management layer" is not recited in the claims at issue in this proceeding, but is recited in claim 1 of the '482 patent, at issue in the related proceedings IPR2015-01751 and IPR2015-01752. However, because

IPR2015-01750
Patent 8,484,111 B2

view of the specification would readily be understood to a person of
ordinary skill in the art to mean 'a layer that automatically detects changes
*external to the application program* which impact *how* the application
program *should operate*.'" *Id.* at 14 (citing Ex. 2032 ¶ 27; Ex. 2033 ¶ 27)
(emphases added); *see id.* at 18. Patent Owner argues, in comparison, that
"detecting changes *internal* to an application program is precisely what the
claimed 'third layer' does."[10] *Id.* at 14 (citing Ex. 2032 ¶¶ 34–36).

As can be seen by a comparison of Patent Owner's proposed
construction with the language of claim 1 of the '482 patent, Patent Owner's
construction adds an additional requirement to the express language of the
claim that any detected changes are "external to the application program."
Pointing to discussion in the '482 patent regarding so-called "intelligent
agents" that search on the internet for relevant regulatory and/or non-
regulatory changes in a selected business area, Patent Owner argues that
"[a]ll of these 'changes' shown in the '482 patent are all 'external to the
application program.'" *Id.* at 16 (citing Ex. 1001, 16:17–34, 19:66–20:6;
Ex. 2032 ¶¶ 32–34; Ex. 2033 ¶¶ 33–34). Patent Owner makes a further
distinction that "changes that affect an application," as claimed, are not
changes affecting the application in any way, but must be "changes which

---

Patent Owner relies on its discussion of this term for its proposed
construction of the recited "fourth portion" of the '111 patent, we discuss
Patent Owner's arguments in this regard.

[10] Patent Owner's argument in this regard is in reference to claim 1 of
the '482 patent. We note that the third layer of this claim does not recite
detecting any changes per se, but instead the claim recites that the third layer
"retrieves the data in the first and second layers in order to generate the
functionality and user interface elements of the application." *See*
IPR2015-01751, Ex. 1001 (the '482 patent), 32:23–26.

IPR2015-01750
Patent 8,484,111 B2

impact how the application program should operate." *See* Tr. 66:21–69:3;
Ex. 2032 ¶ 27; Ex. 2033 ¶ 27.

Patent Owner further argues that "it would be nonsensical for
application-internal 'changes' to be the 'changes that affect the
application.'" PO Resp. 17. According to Patent Owner,

> The specification includes an example that highlights that the
> definition proposed by the Patent Owner for the "change
> management layer" and the associated "change" are the
> broadest reasonable interpretation when read in light of the
> specification. The '482 patent explains that regulations and
> technical requirements are constantly changing, and that these
> changes are posted in various media, including paper,
> microfiche and electronic media.

*Id.* The example from the Specification cited by Patent Owner is as follows:

> Assume that a federal regulation, governing disposal of
> hazardous waste in landfills, is amended so that the regulation
> now requires analysis, reporting and record keeping of landfill
> samples. Part of the change language addresses what landfill
> sample information must be collected, including landfill type,
> landfill cell, parameter(s) sampled, identification of
> chain-of-custody, and laboratory results. **The change is posted
> in the Federal Register and becomes promptly available as a
> hard copy (paper) and electronically, on the Internet**.
>
> The invention begins tracking change using one or more
> intelligent agents ("IA's"). An "intelligent agent" is a
> specialized program that resides on a network, or at a server as
> an applet, and can make decisions and perform tasks based on
> pre-defined rules. Preferably, two or more IA's used by a
> business will have sufficiently different assignments that at
> most modest overlap occurs between the IA's. An IA function
> is part of the Logic Menu, which is discussed subsequently.
>
> A change made to landfill waste regulations is identified
> by an IA on the Internet, and **the relevant change information
> is routed to a selected metadata table in the invention**. The
> change information includes one or more of five

12

IPR2015-01750
Patent 8,484,111 B2

> recommendations: (1) create a new WorkList; (2) change one or
> more data entry forms; (3) create one or more new reports;
> (4) create a new process; and (5) add one or more new
> document images. Configuration Users can choose to
> automatically configure the preceding recommendation based
> on a set of default conditions, or can manually implement the
> configuration using a configuration toolkit.

Ex. 1001, 10:36–63 (emphases added by Patent Owner); PO Resp. 17–18.

In its Reply, Petitioner argues that Patent Owner's proposed
construction "should be rejected because it does not construe the claim
language at issue in this proceeding," but instead Patent Owner's analysis is
entirely focused on language present in the claims of the '482 patent.
Pet. Reply 7. Petitioner asserts that the "claim language is plain on its face,
includes no terms of art and requires no construction." *Id.* at 5 (citing
Ex. 1058, 44:19–45:4, 83:13, 95:16–20).

Petitioner also addresses Patent Owner's proposed construction. In
this regard, Petitioner argues that "[r]ather than interpret 'changes,' [Patent
Owner] twice repeats the word in its construction and tacks on additional
limitations that result in [Patent Owner's] construction failing to give
'changes' its broadest reasonable interpretation." Pet. Reply 8. According
to Petitioner, the "**only** limitation the '111 [patent] claims impose on
'changes' is that they 'affect the information in the first . . . or . . . second
portion of the server.'" *Id.* Petitioner asserts that the "plain language of the
claims does not limit 'changes' to the narrow category of changes [Patent
Owner] alleges (i.e., those that arise from changes external to the
application)." *Id.*

We agree with Petitioner that the Specification of the '111 patent
"nowhere refers to changes 'that arise from changes external to the

13

IPR2015-01750
Patent 8,484,111 B2

application,' and does not limit 'changes' in any way" and "[t]here is no disclaimer in the '111 patent that limits the meaning of 'changes' in the manner [Patent Owner] alleges." Pet. Reply 9; *see* Ex. 1062 ¶¶ 4–5.

While Patent Owner points to several portions of the Specification of the '482 patent[11] in support of its argument that the claimed changes should be limited to those external to the application, we are not persuaded that the discussion in the Specification rises to the level of "reasonable clarity, deliberateness, and precision" necessary to provide a special definition for the claim term. *See In re Paulsen*, 30 F.3d at 1480. In fact, as noted by Petitioner, the "specification also describes an embodiment in which intelligent agents pursue 'internal' as well as 'external Web activities.'" Pet. Reply 12 (citing Ex. 1001, 19:66–67).

Based on the evidence in this record, we determine that the plain meaning of the phrase "fourth portion of the server being configured to automatically detect changes that affect the information in the first portion of the server or the information in the second portion of the server" is consistent with the Specification. We are not persuaded that the recited function of "automatically detect[ing] changes" is limited to detecting changes external to the application, as proposed by Patent Owner. No further express construction of the claim phrase is necessary.

### D. *Principles of Law – Anticipation and Obviousness*

To prevail in its challenges to the patentability of the claims, a petitioner must establish facts supporting its challenges by a preponderance of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). "In an [*inter*

---

[11] The '111 patent and the '482 patent "have substantially identical specifications and drawings." PO Resp. 1 n.2.

IPR2015-01750
Patent 8,484,111 B2

*partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review).

To establish anticipation, each and every element in a claim, arranged as recited in the claim, must be found in a single prior art reference. *See Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008); *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001). Although the elements must be arranged or combined in the same way as in the claim, "the reference need not satisfy an *ipsissimis verbis* test," i.e., identity of terminology is not required. *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009); *accord In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990).

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *See KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the

IPR2015-01750
Patent 8,484,111 B2

prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). In an *inter partes* review, Petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016). Thus, to prevail Petitioner must explain how the proposed combinations of prior art would have rendered the challenged claims unpatentable.

At this final stage, we determine whether a preponderance of the evidence of the record shows that the challenged claims are anticipated by and/or would have been obvious in view of asserted prior art. We analyze the asserted grounds of unpatentability in accordance with those principles.

### E. Anticipation by Popp

Petitioner asserts that independent claim 13, as well as claims 14–18 which depend therefrom, are anticipated by Popp. Pet. 13–23. Patent Owner argues that Popp does not disclose a "fourth portion," as recited in independent claim 13. PO Resp. 22–25. We have reviewed the entire record before us, including the parties' contentions and supporting evidence presented during this trial. For the reasons explained below, we determine that Petitioner has demonstrated, by a preponderance of the evidence, that claims 13–18 are unpatentable.

### 1. Overview of Popp

Popp relates to an "object-oriented approach [that] provides the ability to develop and manage Internet transactions." Ex. 1004, Abstract. According to Popp, "[l]ocal applications can be accessed using any workstation connected to the Internet regardless of the workstation's configuration." *Id.* Popp describes that "[o]nce [a] connection is

IPR2015-01750
Patent 8,484,111 B2

established, the present invention is used with an application on the server side of the connection to dynamically generate Web pages [that] contain application information and provide the ability for the user to specify input." *Id.* at 3:55–59. Web pages can be generated in response to the user input. *Id.* at 3:61–63.

Figure 2 of Popp is reproduced below:



Figure 2

As seen in Figure 2 of Popp, Client Browser 202 is connected via Internet 204 to Server Domain 208, which includes among other things Application 214 and Database 224. Ex. 1004, 6:40–7:23, 7:31–34. Application 214 includes objects 216 that correspond to the HTML elements that define a Web page and are arranged in a tree structure that corresponds to the hierarchical structure of the HTML elements that they implement. *Id.* at 12:21–26. The self-contained modules, or components, may be shared by one or more Web pages in a single application and/or across multiple applications executing on a server. *Id.* at 4:27–33, 4:41–43, 17:54–18:32.

IPR2015-01750
Patent 8,484,111 B2

A scriptedControl object controls generation of a Web page. *Id.* at 18:62–19:19, Fig. 6A. Further, an inputControl object handles pushing and pulling data to/from the Web page and the external data source (e.g., database 224). *Id.* at 21:61–22:67, Fig. 6B. The inputControl object determines, for example, when a database entry should be updated based on information input to the Web page and sends an appropriate message to update the database. *Id.* at 21:37–49.

### 2. *Claim 13*

Claim 13 recites a "system, comprising: a server accessible by a browser executed on a client device, the server including a first portion, a second portion, a third portion, and a fourth portion." Petitioner asserts that "Popp's Server Domain 208 is accessible by Client Browser 202, executed on a client device." Pet. 18 (citing Ex. 1004, Fig. 2). According to Petitioner, Server Domain 208 of Popp "includes database 224 (first portion), object tree 216 (second portion), internal application 214 (third portion), and inputControl object 664 (fourth portion, used by internal application 214)," corresponding to the server portions recited in claim 13. *Id.* (citing Ex. 1004, 7:52–58, 12:21–32, Figs. 2, 6B); *see id.* at 14–17; Ex. 1002 ¶¶ 31, 34, 35, 40. Popp further discloses that "Database 224 can be resident on the same server as application 214," which also includes object tree 216 and inputControl object 664. Ex. 1004, 7:32–33, 7:52–58, 12:21–32; *see* Pet. 17, 18; Ex. 1002 ¶¶ 22, 31, 34, 35, 40. Thus, according to Petitioner, Popp discloses all four claimed "portions" on the same server.

Regarding the claimed "first portion of the server having information about unique aspects of a particular application," Petitioner describes the Web page of Popp as "meet[ing] the 'application' whose functionality and

18

IPR2015-01750
Patent 8,484,111 B2

UI are dynamically generated" of the claim. Pet. 13–14 (citing Ex. 1002
¶ 32). According to Petitioner, Popp discloses that database 224 (first
portion) "contain[s] information about unique aspects of a particular Web
page (application), e.g., for an Automobile Shopper's application that can be
used by a prospective car buyer to select a car." *Id.* at 18 (citing Ex. 1004,
9:4–10, 9:56–61); *see* Ex. 1002 ¶ 31.

The claim further recites "the second portion of the server [has]
information about user interface elements and one or more functions
common to various applications, the various applications including the
particular application." Petitioner relies on the following as disclosing this
claimed feature:

> Web page objects 216 [of Popp] correspond to HTML elements
> that define a web page and include component sub-trees
> representing user interface portions (e.g., text boxes, check
> boxes, radio buttons) that can be shared across Web pages, and
> thus contain information about user interface elements (e.g.,
> data entry elements) and functions (e.g., receiving and
> processing input data) common to various applications (Web
> pages), including any particular application (Web page) whose
> data is stored in the database.

Pet. 15 (citing Ex. 1002 ¶ 34); *see id.* at 18–19 (citing Ex. 1004, 2:33–41,
4:26–33, 4:41–43, 11:37–44, 12:21, 17:54–55, 18:32–43); Ex. 1002 ¶¶ 26,
31.

Regarding the claimed "third portion of the server being configured to
dynamically generate a functionality and a user interface for the particular
application," Petitioner points to internal application 214 of Popp, which
"includes scriptedControl Object 602 to generate and manage a Web page,"
as disclosing this claimed feature. Pet. 15 (citing Ex. 1004, 8:49–55, 18:62–
65, 19:1–2; Ex. 1002 ¶ 36); *see id.* at 19 (citing Ex. 1004, 3:55–59, 7:45–49,

IPR2015-01750
Patent 8,484,111 B2

8:49–55, 18:65–67, 19:29–38, 31:44–49).  According to Petitioner, the "scriptedControl object 602 retrieves application-specific data from the database (first portion) and combines it with the object tree (second portion) in order to dynamically generate the functionality and user interface for the Web page (application)," thus disclosing the claim limitation that "the functionality and the user interface of the particular application [are] based on the information in the first portion of the server and the information in the second portion of the server."  *Id.* at 15 (citing Ex. 1004, 18:65–67, 19:29–38, 22:37–42, Figs. 6A, 6B; Ex. 1002 ¶¶ 36–37); *see id.* at 19 (citing Ex. 1004, 19:18–19, 19:35–38).

Petitioner further points to the fact that Popp's "Web page can include a Java applet that, when downloaded over an established connection between the client and the server and processed by a browser, presents the UI and functionality to the user," as disclosing that the claimed "third portion of the server [is] configured to send the functionality and the user interface for the particular application to the browser upon establishment of a connection between the server and the client device."  Pet. 16 (citing Ex. 1004, 31:1–3; Ex. 1002 ¶¶ 38, 39); *see id.* at 20 (citing Ex. 1004, 3:55–65, Fig. 2).

Finally, regarding the claimed "fourth portion of the server [that is] configured to automatically detect changes that affect the information in the first portion of the server or the information in the second portion of the server," Petitioner relies on Popp's inputControl object 664.  Pet. 16–17.  According to Petitioner, inputControl object 664 is responsible for detecting and responding to user input received from the web page user interface, such as a modification of field 632 in Web page 662.  *Id.* (citing Ex. 1004, 22:28–62; Ex. 1002 ¶ 40); *see id.* at 20.  Petitioner further asserts that "[w]hen

inputControl object 664 detects a change . . . , the Web page objects (second portion) are automatically modified by storing the data retrieved from the Web page form in text object 654 and/or context object 628, and the database 630 (first portion) is automatically modified to store the changed data." *Id.* at 17 (citing Ex. 1004, 22:28–62, Fig. 6B; Ex. 1002 ¶ 40).

We agree with Petitioner's mapping of Popp to claim 13, and adopt it as our own.

Patent Owner argues that Popp does not disclose the "fourth portion" recited in claim 13. PO Resp. 22–25. Regarding claim 13 specifically, Patent Owner refers to its arguments regarding claim 1 of the '482 patent, and asserts that "[f]or similar reasons, Popp's disclosure of reaction to user input text is inadequate to anticipate the 'fourth portion' limitation required in every claim of the '111 patent." *Id.* at 25 (citing Ex. 2032 ¶ 65; Ex. 2033 ¶¶ 49-50). We, thus, address Patent Owner's arguments regarding claim 1 of the '482 patent herein.

In this regard, Patent Owner argues that "Popp does not disclose a 'change management layer' which 'automatically detects changes which impact how the application program should operate' where those 'changes' 'arise from changes external to the application.'" *Id.* at 24 (citing Ex. 2032 ¶¶ 63–64; Ex. 2033 ¶¶ 46–50). Patent Owner argues that Popp instead discloses "automatically detect[ing] changes from [an application's] *own operation* – in this case, user input of text data via a user interface." *Id.* at 23 (citing Ex. 2031, 67:10–25). Patent Owner's arguments rely upon its proposed construction of the claimed "change management layer" and "fourth portion," which we do not adopt for the reasons discussed above (*see supra* Section II.C). We are persuaded by Petitioner's assertion that

IPR2015-01750
Patent 8,484,111 B2

automatically detecting a change that affects information (e.g., an employee name) stored in the database (i.e., the claimed "first portion") discloses detecting a change that affects the application, as claimed. *See, e.g.,* Ex. 1001, 12:20–32 (describing the business content layer (i.e., "first portion") as a database that may include data associated with a selected area of business, such as finance or human resources).

Based on the evidence of record, we determine Petitioner has shown, by a preponderance of the evidence, that Popp anticipates claim 13.

### 3. Claims 14–18

For each of claims 14–18, Petitioner provides arguments as to how each claim limitation is disclosed in Popp, and relies upon Dr. Crovella's testimony. *See* Pet. 20–23 (citing Ex. 1004, 2:25–32, 3:55–63, 16:48–17:52, 18:32–34, 19:50–20:37, 21:61–22:13, 22:37–48, 22:64–65, Fig. 2; Ex. 1002 ¶¶ 41–45). We agree with Petitioner's mapping of Popp to these claims, and adopt it as our own.

Patent Owner does not substantively discuss dependent claims 14–18, apart from its discussion of independent claim 13, which we have addressed above. *See* PO Resp. 22–25.

Based on the evidence of record, we determine Petitioner has shown, by a preponderance of the evidence, that Popp anticipates claims 14–18.

### F. Anticipation by Kovacevic

Petitioner asserts that independent claim 13, as well as claims 14–18 which depend therefrom, are anticipated by Kovacevic. Pet. 24–33. Patent Owner argues that Kovacevic does not disclose a "fourth portion," as recited in independent claim 13. PO Resp. 25–28. We have reviewed the entire record before us, including the parties' contentions and supporting evidence

IPR2015-01750
Patent 8,484,111 B2

presented during this trial. For the reasons explained below, we determine that Petitioner has demonstrated, by a preponderance of the evidence, that claims 13–18 are unpatentable.

### 1. Overview of Kovacevic

Kovacevic relates to a system called MUSE that uses a model-based technology to implement an intelligent tutoring system having a flexible user interface. Ex. 1005, Abstract. The system described in Kovacevic includes an application-specific library, which "contains procedural code implementing the functional core of applications whose UIs are to be generated," and an interaction-specific library, which "contains a library of communications primitives—interaction techniques and presentation objects—to be used when assembling UI structures." *Id.* at 117. The MUSE program uses these libraries to build and generate a user interface. *Id.* As further discussed in Kovacevic, the libraries, and if desired the entire MUSE program, could be transported over a browser using Java. *Id.* Kovacevic also discusses a sequencing control primitive that monitors and updates the system when something affecting information-flow-control primitives occurs. *Id.* at 114.

### 2. Claim 13

Claim 13 recites a "system, comprising: a server accessible by a browser executed on a client device, the server including a first portion, a second portion, a third portion, and a fourth portion." Petitioner asserts that "Kovacevic's SLOOP Server is accessible over the Web by an HTML browser executed on a UI client device." Pet. 28 (citing Ex. 1005, Fig. 1). According to Petitioner, the "SLOOP Server includes the application-specific library (first portion), the interaction-specific library (second

IPR2015-01750
Patent 8,484,111 B2

portion), the main MUSE program (third portion), and the sequencing control primitives (fourth portion)," corresponding to the server portions recited in claim 13. Pet. 28 (citing Ex. 1005, 117 (col. 2 ¶ 7)); *see id.* at 24–28; Ex. 1002 ¶¶ 50, 51, 53, 58. Thus, according to Petitioner, Kovacevic discloses all four claimed "portions" on the same server.

Regarding the claimed "first portion of the server having information about unique aspects of a particular application," Petitioner describes that a "tutoring course generated with a particular UI is a particular 'application' as recited in the claims." Pet. 24 (citing Ex. 1002 ¶ 50). According to Petitioner, Kovacevic discloses that a "particular tutoring course is represented by an application-specific model specification with software primitives provided in an application-specific library." *Id.* (citing Ex. 1005, 117 (col. 1 ¶ 4, col. 2 ¶ 7); Ex. 1002 ¶ 50); *see id.* at 28–29.

The claim further recites "the second portion of the server [has] information about user interface elements and one or more functions common to various applications, the various applications including the particular application." Petitioner relies on an interaction-specific library in Kovacevic as disclosing this claimed feature. Pet. 24–25, 29. According to Petitioner, the interaction-specific library has "information about user interface elements (e.g., communication UI primitives in the interaction-specific library) and one or more functions (e.g., mapping between external inputs and internal forms) common to various applications (including the particular application represented by a downloaded application-specific library)." *Id.* at 24–25 (citing Ex. 1005, 114 (col. 1 ¶ 2), 115 (col. 1 ¶ 2), 116 (col. 1 ¶ 6), 117 (col. 1 ¶ 5); Ex. 1002 ¶ 51); *see id.* at 29 (citing Ex. 1005, 113 (col. 2 ¶ 2), 114 (col. 1 ¶ 2), 117 (col. 1 ¶ 5, col. 2 ¶ 7)).

Regarding the claimed "third portion of the server being configured to dynamically generate a functionality and a user interface for the particular application," Petitioner points to the "main program" of Kovacevic as disclosing this claimed feature. Pet. 25, 29. According to Petitioner, Kovacevic's main program "generates the tutoring application (including the functionality and the UI of the tutoring course) using the primitives in the application-specific library (first portion) and the application-independent interaction-specific library (second portion)." *Id.* at 25 (citing Ex. 1005, 117 (col. 1 ¶ 4, col. 2 ¶ 7); Ex. 1002 ¶¶ 52–53); *see id.* at 29 (citing Ex. 1005, 109 (col. 1 ¶ 3, ¶ 5, col. 2 ¶ 4), 117 (col. 1 ¶ 4, col. 2 ¶ 7)). According to Petitioner, this generation of the tutoring application "is done by mapping application model primitives provided in the application-specific library (first portion) onto UI primitives including the communication primitives in the interaction-specific library (second portion) to construct a fully specified UI," thus disclosing the claim limitation that "the functionality and the user interface of the particular application [are] based on the information in the first portion of the server and the information in the second portion of the server." *Id.* at 25 (citing Ex. 1002 ¶ 54); *see id.* at 29–30 (citing Ex. 1005, 115 (col. 1 ¶ 2), 116 (col. 1 ¶ 6), Figs 5, 6, 8).

Petitioner further points to the fact that "[h]aving downloaded the application-specific library for a particular tutoring application, [Kovacevic's] main MUSE program generates and sends the application's functionality and UI to be rendered in the client's browser," as disclosing the limitation that "the third portion of the server [is] configured to send the functionality and the user interface for the particular application to the browser upon establishment of a connection between the server and the

IPR2015-01750
Patent 8,484,111 B2

client device." Pet. 27–28 (citing Ex. 1005, 110 (col. 1 ¶ 4), 117 (col. 1 ¶ 4, col. 2 ¶ 7); Ex. 1002 ¶¶ 52–56); *see id.* at 30 (citing Ex. 1005, 108 (col. 1 ¶ 2, ¶ 4), 117 (col. 2 ¶ 7)).

Finally, regarding the claimed "fourth portion of the server [that is] configured to automatically detect changes that affect the information in the first portion of the server or the information in the second portion of the server," Petitioner relies on Kovacevic's sequencing control primitives. *Id.* at 25–26. Kovacevic describes that the "sequencing control primitives maintain and monitor the relevant UI context. They update the context whenever something potentially affecting [information-flow-control] primitives happens, and they constantly evaluate the context to enable/disable those primitives." Ex. 1005, 114 (col. 2 ¶ 6); *see* Pet. 30. According to Petitioner, "[c]hanges such as user input via the UI or selection of UI elements affect the information in the second portion of the server, e.g., by causing certain UI elements to be enabled or disabled," and the sequencing control primitives of Kovacevic monitor for such user input to enable appropriate enable/disable response of the UI element when a user selection is made. Pet. 25–26 (citing Ex. 1005, 114 (col. 2 ¶ 6), 115 (col. 2); Ex. 1002 ¶ 57).

We agree with Petitioner's mapping of Kovacevic to claim 13, and adopt it as our own.

Patent Owner argues that Kovacevic does not disclose the "fourth portion" recited in claim 13. PO Resp. 25–28. Regarding claim 13 specifically, Patent Owner refers to its arguments regarding claim 1 of the '482 patent, and asserts that "[l]ikewise, claims 13–18 of the '111 patent cannot be anticipated by Kovacevic because Kovacevic does not disclose the

IPR2015-01750
Patent 8,484,111 B2

required 'fourth portion.'" *Id.* at 28 (citing Ex. 2032 ¶ 73; Ex. 2033 ¶ 55). We, thus, address Patent Owner's arguments regarding claim 1 of the '482 patent herein.

In this regard, Patent Owner argues that "[w]hile Kovacevic describes making the website responsive to user interaction, Kovacevic has no disclosure relevant to changes 'external to the application.'" PO Resp. 25 (citing Ex. 2032 ¶ 69; Ex. 2033 ¶ 54). Patent Owner argues that "change[s] from a user interacting with the user interface, or . . . change[s] from a user selecting different user interface elements" are not "external to an application." *Id.* at 27; *see id.* at 27–28 (citing Ex. 2032 ¶¶ 71–72; Ex. 2033 ¶¶ 54–55). Again, Patent Owner's arguments rely upon its proposed construction of the claimed "change management layer" and "fourth portion," which we do not adopt for the reasons discussed above (*see supra* Section II.C).

As noted above, Petitioner relies on the UI primitives in the interaction-specific library of Kovacevic as disclosing the claimed second portion. We are persuaded by Petitioner's assertion that detecting user input (a change) that affects whether certain UI elements are enabled or disabled (i.e., information regarding the UI primitives in the second portion) discloses the fourth portion's claimed function of detecting changes that affect the information in the second portion.

Based on the evidence of record, we determine Petitioner has shown, by a preponderance of the evidence, that Kovacevic anticipates claim 13.

### 3. *Claims 14–18*

For each of claims 14–18 Petitioner provides arguments as to how each claim limitation is disclosed in Kovacevic, and relies upon

IPR2015-01750
Patent 8,484,111 B2

Dr. Crovella's testimony. *See* Pet. 31–33 (citing Ex. 1005, 110 (col. 1 ¶¶ 4–5, col. 2 ¶ 2), 112 (Fig. 4), 113 (col. 2 ¶ 2), 114 (col. 1 ¶ 2), 117 (col. 1 ¶ 4); Ex. 1002 ¶¶ 59–63). We agree with Petitioner's mapping of Kovacevic to these claims, and adopt it as our own.

Patent Owner does not substantively discuss dependent claims 14–18, apart from its discussion of independent claim 13, which we have addressed above. *See* PO Resp. 28.

Based on the evidence of record, we determine Petitioner has shown, by a preponderance of the evidence, that Kovacevic anticipates claims 14–18.

### G. Obviousness in View of Balderrama and Java Complete

Petitioner asserts that independent claim 13, as well as claims 14–18 which depend therefrom, would have been obvious in view of the combination of Balderrama and Java Complete. Pet. 34–45. Patent Owner argues that Balderrama does not disclose a "fourth portion," as recited in independent claim 13. PO Resp. 28–32. We have reviewed the entire record before us, including the parties' contentions and supporting evidence presented during this trial. For the reasons explained below, we determine that Petitioner has demonstrated, by a preponderance of the evidence, that claims 13–18 are unpatentable.

### 1. Overview of Balderrama

Balderrama relates to a system that can offer various goods for sale, in a self-service fashion with an "electronic device capable of accepting and transmitting a customer's input," such as a touch-screen display. Ex. 1006, 1:8–12, Fig. 1. The system of Balderrama includes template presentations and a database containing items intended for sale at a particular sales outlet.

*Id.* at 2:11–16, Fig. 3; *see also id.* at 6:48–58 (discussing template files), 8:64–9:2 (discussing "transmitted copy" of a template); 9:15–20 (discussing database records). A "configuring routine" uses information from the template presentation and the database for a particular sales outlet to create a presentation to display on the electronic device at the sales outlet. *Id.* at 11:37–48, Fig. 3 (element 84). The system is also configured to handle modifications to the database and/or updates to the presentation template. *Id.* at 2:17–21, 11:64–67, Fig. 6. Update/modification detector 82 receives information about updates to the template presentation and/or modifications to the database, and acts accordingly to update the presentation at the customer terminal. *Id.* at 8:21–64, 9:7–27, 10:11–24, Fig. 3 (arrows 81b, 87b, 83b).

## 2. *Overview of Java Complete*

Java Complete is a compilation of several articles in DATAMATION Magazine, discussing a "new simplified object-based, open-system [programming] language that allows software developers to engineer applications that can be distributed over the Internet." *See* Ex. 1007, 1–3, 28. Java Complete provides information about the Java programming language. For example, as discussed in the magazine, "Java reinvents the way applications are distributed to clients and executed," and provides "an easy way to deliver business information broadly." *Id.* at 40. As further described, "network-centric Java applets . . . don't have to be preinstalled— they install themselves just in time, on the fly, and deinstall themselves when they're no longer needed." *Id.* at 42. One example provided in Java Complete of a type of business application that could be built with Java applets is an order-entry system. *Id.*

IPR2015-01750
Patent 8,484,111 B2

### 3. *Claim 13*

Claim 13 recites a "system, comprising: a server . . . including a first portion, a second portion, a third portion, and a fourth portion." Petitioner asserts that "Balderrama's manager station 10 is a server accessible by customer terminal 20a (client device) over POS LAN 14." Pet. 39 (citing Ex. 1006, Fig. 1). According to Petitioner, Balderrama's "[m]anager station 10 (server) includes in-store database 86 with records/files 87a (first portion), transmitted copy template presentation 80 (second portion), configuring routine 84 (third portion), and update/modification detector 82 (fourth portion)," corresponding to the server portions recited in claim 13. *Id.* at 40 (citing Ex. 1006, Fig. 3); *see id.* at 34–37; Ex. 1002 ¶¶ 71–73, 77. Petitioner asserts that each of these portions is "disclosed as being stored or executed on manager station 10." Pet. 37 (citing Ex. 1006, 8:67–9:2, 9:16– 27, 11:38–46). Thus, according to Petitioner, Balderrama teaches all four claimed "portions" on the same server.

Regarding the claimed "first portion of the server having information about unique aspects of a particular application," Petitioner describes Balderrama's "order-entry presentation for a particular sales outlet (configured presentation 90)," which "is a UI for a user to view items for sale at the outlet and enter and order in an automated fashion, e.g., via a touch screen," as the "particular application" of the claim. *Id.* at 34 (citing Ex. 1006, 1:8–23, 2:11–16, Fig. 1; Ex. 1002 ¶¶ 64, 71). Balderrama discloses that in-store database 86 with records/files 87a (i.e., the first portion) "contain data records/information about items intended for sale at a particular sales outlet" (i.e., the "particular application"). Ex. 1006, 9:17– 21, Fig. 3; *see* Pet. 34–35, 40; Ex. 1002 ¶¶ 64, 71.

The claim further recites "the second portion of the server [has]
information about user interface elements and one or more functions
common to various applications, the various applications including the
particular application."  Petitioner describes Balderrama's disclosure of
"shared-across-outlets template presentation 80 from headquarters is
transmitted to manager station 10 (the outlet's server) for combination with
the outlet-specific data," as disclosing this claimed feature.  Pet. 35–36
(citing Ex. 1006, 6:48–58, 8:67–9:2, 11:43–46; Ex. 1002 ¶ 72); *see id.* at 40–
41 (citing Ex. 1006, 6:48–58, 7:19–23, 8:64–9:2, 11:43–46, Figs. 3, 11).

Regarding the claimed "third portion of the server being configured to
dynamically generate a functionality and a user interface for the particular
application," Petitioner describes that "Balderrama employs a configuring
routine 84 . . . to retrieve data from the outlet-specific database 86 (first
portion) and combine it with the generic template presentation 80 (second
portion) in order to generate the functionality and user interface elements of
the configured presentation 90 (application) for presentation to the
customer," thus disclosing this claimed feature.  Pet. 36 (citing Ex. 1006,
11:38–46, Fig. 3; Ex. 1002 ¶¶ 73–74); *see id.* at 41 (citing Ex. 1006, 11:38–
46, 14:64–65, 16:20–21, 16:55–17:5, Fig. 3).  According to Petitioner,
"[c]onfiguring routine 84 matches items in the template presentation (second
portion) with items in the database (first portion), activating the sales items
that are sold in the particular sales outlet, and incorporating those items'
prices from the database into the corresponding cells in the template
presentation," thus disclosing the claim limitation that "the functionality and
the user interface of the particular application [are] based on the information
in the first portion of the server and the information in the second portion of

the server." *Id.* at 36 (citing Ex. 1006, 14:64–65, 16:20–21, 16:55–17:5; Ex. 1002 ¶ 73); *see id.* at 41 (citing Ex. 1006, 8:67–9:2, 10:10–13, Fig. 3).

Regarding the claimed "fourth portion of the server [that is] configured to automatically detect changes that affect the information in the first portion of the server or the information in the second portion of the server," Petitioner relies on Balderrama's update/modification detector 82. Pet. 36–37. According to Petitioner, update/modification detector 82 "automatically detects changes to the outlet-specific database (affecting the information in the first portion of the server) or the generic template presentation (affecting the information in the second portion of the server)." *Id.* at 36 (citing Ex. 1006, 10:14–21, 11:64–67; Ex. 1002 ¶ 77); *see id.* at 42 (citing Ex. 1006, 2:16–21, 10:14–21, 11:64–67, 12:34–38, Fig. 3). Petitioner further asserts that "[i]n response to update/modification detector 82 detecting changes . . . , a currently-running presentation is interrupted and re-configured." *Id.* at 37 (citing Ex. 1006, 9:7–15; Ex. 1002 ¶ 77).

Petitioner relies on Java Complete in combination with Balderrama for teaching that the server is "accessible by a browser executed on a client device," as claimed, and that the claimed "third portion of the server [is] configured to send the functionality and the user interface for the particular application to the browser upon establishment of a connection between the server and the client device" *Id.* at 38–40. According to Petitioner, Balderrama teaches distributing the application from a server to a client over a LAN network but does not explicitly state that the server is accessible by a browser executed on the client device. *Id.* at 37 (citing Ex. 1002 ¶ 67). Java Complete "describes using browsers for UI delivery over the Internet and within a company's internal network." *Id.* at 38 (citing Ex. 1007, 30, 31, 40;

IPR2015-01750
Patent 8,484,111 B2

Ex. 1002 ¶ 68). Petitioner asserts that "[i]t would have been obvious to a [person of ordinary skill in the art] to implement a browser on Balderrama's customer terminal for receiving and executing the order-entry application, as browsers were commonly used to receive UI applications in client-server systems." *Id.* at 37–38 (citing Ex. 1002 ¶¶ 68–69).

Petitioner further points to Java Complete's teaching that "the client browser executes a Java applet received from the server to dynamically generate the UI functionality of the application," asserting that a person of ordinary skill "would have been motivated to implement Balderrama's order-entry application as a Java applet delivered to a browser executed by the customer terminal (client device) because of the ease-of-implementation benefits of using Java and readily-available web browsers." *Id.* at 38 (citing Ex. 1007, 32, 40, 42; Ex. 1002 ¶¶ 68–69). According to Petitioner, Java applets are delivered in client-server systems by being downloaded upon establishment of a connection between the server and the client device. *Id.* at 39 (citing Ex. 1007, 32). Thus, Petitioner asserts:

> [i]n the obvious combination of Balderrama and Java Complete, customer terminal 20a/94 (client device) executes a browser to access the server (manager station 10), and configuring routine 84 (third portion of the server) is configured to send the functionality and UI for the particular application (configured presentation 85) to the browser upon establishment of a connection between the server and the client device.

*Id.*

We agree with Petitioner's mapping of Balderrama and Java Complete to claim 13, and adopt it as our own.

Patent Owner argues that Balderrama does not disclose the "fourth portion" recited in claim 13. PO Resp. 28–32. Regarding claim 13

IPR2015-01750
Patent 8,484,111 B2

specifically, Patent Owner refers to its arguments regarding claim 1 of the '482 patent, and asserts that "[s]imilarly, the Balderrama in view of Java Complete [combination] cannot render any claim of the 'fourth portion' of claim 13 of the '111 patent obvious." *Id.* at 32 (citing Ex. 2032 ¶ 82; Ex. 2033 ¶ 62). We, thus, address Patent Owner's arguments regarding claim 1 of the '482 patent herein.

In this regard, Patent Owner asserts that the update/modification detector 82 of Balderrama (upon which Petitioner relies as teaching the claimed change management layer) merely "detects [manual] user input" and argues that "[o]ne of ordinary skill in the art would not recognize the 'update/modification detector 82' as [a] 'change management layer' that detects 'changes' under the broadest reasonable interpretation" thereof. PO Resp. 29 (citing Ex. 2032 ¶¶ 74–75, 77; Ex. 2033 ¶ 56; Ex. 1006, 2:10–21, 10:6–9, Table A (col. 7)). Patent Owner further argues that update/modification detector 82 merely notifies the system of a detected change. *Id.* at 30 (citing Ex. 1006, 9:2–14). Again, Patent Owner's arguments rely upon its proposed construction of the claimed "change management layer" and "fourth portion," which we do not adopt for the reasons discussed above (*see supra* Section II.C).

We are persuaded by Petitioner's assertion that notifying Balderrama's update/modification detector 82 of a change in data records or template presentations, *see* Ex. 1006, Fig. 3, constitutes the claimed function of the "fourth portion."

Based on the evidence of record, we are persuaded that Petitioner has shown that the combination of Balderrama and Java Complete teaches or suggests all of the limitations of claim 13, and has articulated sufficient

IPR2015-01750
Patent 8,484,111 B2

reasoning why it would have been obvious to combine these references in the proposed manner. We, thus, determine Petitioner has shown, by a preponderance of the evidence, that the combination of Balderrama and Java Complete renders claim 13 obvious.

### 4. Claims 14–18

For each of claims 14–18, Petitioner provides arguments as to how each claim limitation is disclosed in the combination of Balderrama and Java Complete, and relies upon Dr. Crovella's testimony. *See* Pet. 42–45 (citing Ex. 1006, 1:8–14, 6:48–63, 9:13–21, 16:55–17:5, Fig. 3; Ex. 1007, 42; Ex. 1002 ¶¶ 78–82). We agree with Petitioner's mapping of Balderrama and Java Complete to these claims, and adopt it as our own.

Patent Owner does not substantively discuss dependent claims 14–18, apart from its discussion of independent claim 13, which we have addressed above. *See* PO Resp. 32.

Based on the evidence of record, we determine Petitioner has shown, by a preponderance of the evidence, that the combination of Balderrama and Java Complete renders claims 14–18 obvious.

## III.    CONCLUSION

For the foregoing reasons, we determine that Petitioner has demonstrated, by a preponderance of the evidence, that claims 13–18 are unpatentable under 35 U.S.C. § 102 as anticipated by Popp; claims 13–18 are unpatentable under 35 U.S.C. § 102 as anticipated by Kovacevic; and claims 13–18 are unpatentable under 35 U.S.C. § 103 as obvious in view of Balderrama and Java Complete.

IPR2015-01750
Patent 8,484,111 B2

IV.    ORDER

Accordingly, it is

ORDERED that claims 13–18 of U.S. Patent No. 8,484,111 B2 are
held *unpatentable*; and

FURTHER ORDERED that, because this is a Final Written Decision,
parties to the proceeding seeking judicial review of the decision must
comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2015-01750
Patent 8,484,111 B2

PETITIONER:

Richard F. Giunta
Elisabeth H. Hunt
Randy J. Pritzker
WOLF, GREENFIELD & SACKS, P.C.
RGiunta-PTAB@wolfgreenfield.com
EHunt-PTAB@wolfgreenfield.com
RPritzker-PTAB@wolfgreenfield.com

PATENT OWNER:

Jonathan Pearce
M. Kala Sarvaiya
Steven C. Sereboff
SOCAL IP LAW GROUP LLP
ksarvaiya@socalip.com
jpearce@socalip.com
ssereboff@socalip.com